ELIZABETH HENDRIX,        )    DAVIDSON PROBATE

                                      )    No. 95P-1802

       Petitioner/Appellee     )

                                        )    Appeal No.

v.                              )    01A01-9709-PB-00536

                                        )

NORA ELIZABETH McGILL,  )

                                        )

       Respondent/Appellant  )

**FILED**

**April 29, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## APPEAL FROM THE DAVIDSON COUNTY PROBATE COURT
## AT NASHVILLE, TENNESSEE

## HONORABLE FRANK G. CLEMENT, JR.,
## PROBATE JUDGE

George H. Cate, Jr.
95 White Bridge Road
Suite 503, Cavalier Building
Nashville, TN 37205
ATTORNEY-AD-LITEM- FOR RESPONDENT/APPELLANT

William Kennerly Burger
SunTrust Bank Building, Suite 306
201 E. Main Street, P. O. Box 1969
Nashville, TN 37133-1969
ATTORNEY FOR PETITIONER/APPELLEE

## AFFIRMED AND REMANDED

WILLIAM H. INMAN, SENIOR JUDGE

CONCUR:

HENRY F. TODD, PRESIDING JUDGE, MIDDLE SECTION

BEN H. CANTRELL, JUDGE

ELIZABETH HENDRIX,              )        DAVIDSON PROBATE
                               )        No. 95P-1802
        Petitioner/Appellee     )
                               )        Appeal No.
v.                             )        01A01-9709-PB-00536
                               )
NORA ELIZABETH McGILL,          )
                               )
        Respondent/Appellant    )

## O P I N I O N

The trial court found the respondent in need of a conservator and appointed Guardianships and Trusts, Inc. as conservator of her person and her estate.

We affirm the judgment of the trial court.

Nora Elizabeth McGill [respondent], who is now 83 years of age, has suffered since birth from disabling cerebral palsy. She is further disabled by severe osteoporosis, a pronounced speech impediment which makes communication very difficult, and a hearing deficit. She has also suffered a mild stroke. In 1960 she was determined to be totally disabled for social security disability purposes.

Respondent never married and lived on a farm with her father and mother, who died in 1960 and 1970 respectively. She has two brothers who now live in Florida, and had a sister who is now deceased. After the death of her parents, respondent's sister assisted her with grocery shopping, banking and daily needs. When the sister died in 1988, respondent employed live-in housekeepers. Her family was consulted by respondent's nurses and occasionally by her doctors in matters concerning her care.

Respondent's relationships with those who assisted her after the death of her sister were troublesome. Her brothers or her niece [petitioner] were

contacted various times in 1988 and 1989 with complaints from the nurse that respondent would not take her medications as directed, and she was hospitalized several times in one year for medication adjustments. Her brother, William, petitioned for appointment of a limited guardian on December 6, 1989. He testified that the initial appointment was at respondent's request:

> "[W]hy Nora had asked me personally if I would get an attorney to try to see what we could do to stop her from - - her signature being valid. So she gave me the name of - - who ended up being the guardian ad litem - - Mr. Larry Brandon in Murfreesboro. He came by to see Nora at the - - at that time she had been sent to Stones River Manor in a nursing home. And he advised her that a guardianship was the only solution that she could have. So she wanted me to be and I asked my sister [Nora] at that time that I would like somebody else because of my age to be with me. And so then she decided on my sister [sic - daughter] Elizabeth, that she could be the guardian with me. So that was the beginning of the guardianship in '89."

The guardianship apparently went reasonably well for several years, and respondent was able to stay at home in her duplex apartment on 18 acres of land in Rutherford County with a live-in registered nurse. According to the terms of the guardianship, she was provided $500.00 each month from her considerable estate for "spending money."[1] However, the nurse reported to petitioner that:

> "she [respondent] was being taken to the bank and that she was writing $500 worth, just all cash money, and that the money was being accumulated at her residence. And the lady was in fear of her and Lizzie's welfare, afraid someone was going to break in and steal it because she was openly showing people that she had it and counting it out . . ."[2]

After her hospitalization in 1989, respondent was taken to a nursing home in Rutherford County. Later petitioner moved respondent to a nursing home in Davidson County, and still later directed that certain of respondent's friends and acquaintances, some of whom were members of The Church Triumphant, not be

---

[1] Respondent's estate consists of improved real property, all of which is currently rented, valued at approximately $450,000.00, plus CD's and cash of approximately $187,000.00.

[2] Two close relatives who kept large sums of cash had been murdered at home during a robbery.

allowed to visit her in the nursing home because petitioner believed they were causing discord between respondent and her family.

Respondent soon became quite dissatisfied with her circumstances and on June 24, 1991 filed a petition for the termination of her guardianship. The reported case of *McGill v. Hendrix,* 913 S.W.2d 184 (Tenn. 1995) recounts respondent's continuous and vigorous litigation to that end.[3]

The case is now before us on appeal from the decision of the Probate Court of Davidson County, which found that "there is no question in my mind that a conservatorship is absolutely necessary for the welfare and benefit of Ms. McGill." The trial court found that the respondent would be best served by a non-family conservator and appointed

> ". . . Guardianships and Trusts Inc. as conservator of Ms. McGill with Ms. [Elizabeth] Hendrix as stand-by conservator in the event, for whatever reason, Guardianships and Trusts should be unable or unwilling to serve . . . it is the conservatorship of the person and the estate so that total control of Ms. McGill shall be in the hands of the conservator, Guardianships and Trusts, Inc."

Review of the findings of fact made by the trial court is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. T.R.A.P. 13(d).

The court in a conservatorship action must determine two facts by clear and convincing evidence. The first fact is the person "is fully or partially disabled,"[4] and the second fact is the person is "in need of assistance from the court." T.C.A. § 34-11-126 (1996); *Crumley v. Perdue,* No. 01A01-9704-CH-00168, LEXIS 774 (Tenn. App.1997).

---

[3]Her attorney at that time, now deceased, also represented one of these acquaintances, and the court removed him as respondent's counsel because of the conflict of interest.

[4]"Disabled person" means any person 18 years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity. T.C.A. § 34-11-101(7) (1996)

The medical evidence of respondent's disability is provided by the report of Dr. J. D. Bryant, who advised that respondent has a medical history of cerebral palsy, hypertension, type II diabetes mellitus, chronic migraine headache, large hiatal hernia with history of esophageal stricture, osteoporosis with multiple fractures of the dorsal spine, left hip fracture, and history of overdose and misuse of prescribed medication requiring hospitalization. He reported that her disabilities were mental and physical and that her mental, physical, social and educational status was fair but her adaptive behavior and social skills were poor. He opined that since admission to the nursing home her condition has stabilized and that she needs continued close supervision to maintain this condition. Further, he opined that she needs a fiduciary for her physical well-being, to handle her financial affairs, to consent to medical treatment and to consent to relocation. He recommended continued medical treatment.

Respondent testified that she did not like Dr. Bryant, who is "the house doctor," and alleged that he forced her to undergo examination. However, she admitted that a psychiatrist was sent to her room the week before the hearing to examine her mental status and that she refused to see him. She also alleged that Dr. E. C. Tolbert, who had been her family doctor for twenty years, had been "blackmailed" by her brother to report that she was disabled. Yet she presented no countervailing medical testimony or report by any doctor that had not previously been considered. Therefore, the unrebutted medical evidence is that respondent is physically and mentally disabled and needs a fiduciary.

The second prong of the test for appointment of a guardian is that she is in need of assistance from the court. The proof in the record is abundant that respondent is unable to competently conduct her own affairs. She lived with

her parents until their deaths; she then had her sister's assistance until her death; she then had live-in nurses until she went to a nursing home. When the nurses observed that she over-medicated herself and handled her finances unadvisedly, they were unable to convince her to do otherwise. She sought help from her brother to invalidate her signature, but when he secured the requested guardianship she refused to see any family members, all of whom she now regards as her enemies. She told the nursing home doctor not to touch her, and she refused psychiatric examination which, if she were correct about her abilities, might well have led to a different result in this case. Indeed, at the hearing in this matter she even refused to answer direct questions from the trial judge:

THE COURT:  "Ms. McGill, I would like to know who typed this for you?

A:  I promised I wouldn't tell.

THE COURT:  You promised you would not tell?

A:  Yes.

THE COURT:  Who did you make that promise to?

A:  The woman that typed that letter.

THE COURT:  Well, I would like to know, Ms. McGill. I'm ordering you to answer the question.

A:  I'm sorry.

MR. CHRISTIAN: *(her counsel)*
You have to answer the Court's question; you must. I know you don't want to but Judge Clement runs this Court and if he tells you something he can command you to do it.

A:  I don't remember her name."

In this and many other instances, respondent has demonstrated that she is unable to independently determine or act in her own best interest.

We find the evidence supports the trial court's finding that the respondent is disabled and in need of the court's assistance. The judgment of the trial court is affirmed at the cost of the appellant and the case is remanded.

_____
William H. Inman, Senior Judge

CONCUR:

_____
Henry F. Todd, Presiding Judge

_____
Ben H. Cantrell, Judge